IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,086






EX PARTE JOSÉ NOEY MARTINEZ, Applicant









ON APPLICATION FOR WRIT OF HABEAS CORPUS 

IN CAUSE NO. CR-0385-95-G(1) FROM THE 370TH DISTRICT COURT

OF HIDALGO COUNTY





 Holcomb, J., delivered the opinion of the Court, in which Keller, P.J.,
Meyers, Price, and Cochran, J.J. joined. Womack, J., concurred. Hervey, J.,
filed a concurring opinion, in which, Keller, P.J., Johnson, and Keasler, JJ.,
joined. 


O P I N I O N 



 In 1996, applicant José Noey Martinez was convicted of capital murder and sentenced
to death. On direct appeal, we affirmed the conviction and sentence. Martinez v. State, No.
AP-72,704 (Tex. Crim. App. 1999) (not designated for publication). In 1999, applicant filed
a writ of habeas corpus, claiming, inter alia, that he received ineffective assistance of counsel
at the punishment phase of trial because (1) "trial counsel failed to investigate and present
a statutorily recognized mitigating defense of temporary insanity resulting from drug
intoxication," and (2), "trial counsel failed to conduct an adequate investigation of mitigating
evidence in the form of physical, emotional, and sexual abuse and neglect in applicant's
background." We ordered these claims filed and set. 

Procedural Background

 The convicting court issued an order designating the following issues, i.e., whether
trial counsel: 

 a. were ineffective at the punishment phase of
Applicant's trial for allegedly failing to investigate and present
a mitigating defense of temporary insanity resulting from drug
intoxication; 

 

 b. were ineffective for allegedly failing to investigate
and present evidence that Applicant's use of rohypnol, and
possibly alcohol, cocaine, and marihuana, on the evening in
question had affected his mental condition at the time of the
offense;

 

 c. were ineffective for allegedly failing to investigate
and present evidence in support of a claim that the amount of
rohypnol ingested by Applicant on the night in question caused
him to not understand or appreciate the wrongfulness of the
conduct at the time he committed the offense;

 

 d. were ineffective for allegedly failing to investigate
and present evidence in support of an argument that Applicant
had been intoxicated on rohypnol at the time he committed this
capital murder and that this should be a factor which mitigated
against imposition of a death sentence;

 

 e. were ineffective for allegedly failing to investigate
and present evidence in support of a claim that Applicant had
suffered heightened aggressive tendencies, or a rage reaction,
from taking rohypnol on the night in question;

 

 f. were ineffective for allegedly failing to develop
evidence concerning, and question the witnesses about, the
extent of Applicant's intoxication on the night in question;

 

 g. were ineffective at the punishment phase of the
trial for allegedly failing to conduct an adequate investigation of
mitigating evidence in the form of physical, emotional, and
sexual abuse and neglect in Applicant's background;

 

 h. were ineffective for allegedly failing to conduct
sufficient investigation and locate evidence allegedly showing
that Applicant and his brother had been sexually abused as
children;

 

 i. were ineffective for allegedly ... locating and
presenting only a small part of the available evidence about his
family background and circumstances which had allegedly been
available;

 

 j. were ineffective, in particular, for [] locating and
presenting only a small part of the alleged evidence that
Applicant had been the victim of severe physical and emotional
abuse and neglect, as well as possible sexual abuse by his father
and mother;

 

 k. were ineffective for allegedly not contacting the
witnesses who could have testified about these matters or not
asking them the appropriate questions to discover this
information;

 

 l. were ineffective for allegedly not utilizing these
witnesses, who were allegedly available and willing to testify on
Applicant's behalf;

 

 m. were ineffective for allegedly not discovering or
presenting evidence that Applicant and his brother Brian had
been physically beaten and suffered emotional abuse from their
step-grandfather; that the Harris County Child Protective
Services had been involved with the family for several years;
and that his mother had also beaten him and his brother and
been verbally abusive[;]

 

 n. were ineffective for allegedly not doing anything to substantiate
the extent of the abuse; for not presenting any testimony by relatives who had
personally observed the abuse; and for conducting an investigation, and
presenting a case, which did not uncover or present any evidence of the abuse
which Applicant's mother allegedly inflicted on Applicant and his brothers or
present any evidence of any alleged sexual abuse at all.


 In order to resolve these issues, trial counsel, Roberto Flores and Fela Olivarez, were
ordered to file affidavits. After considerable delay, the affidavits were ultimately filed in
2003. Thereafter, the convicting court entered findings of fact and conclusions of law and
recommended denying relief. Upon our review of the writ and the convicting court's order,
we were not satisfied that the affidavits of counsel were adequate to resolve the factual
issues, and we ordered a second evidentiary hearing on applicant's Sixth Amendment claims. 
The convicting court heard live testimony from applicant's trial attorneys and considered
additional affidavits from some of applicant's family members and an investigator. The
convicting court entered supplemental findings of fact and conclusions of law and again
recommended denying relief. Based on the affidavits filed by trial counsel, all the affidavits
in support of and in response to the writ, the evidence presented at the live hearing, and the
evidence presented at the trial proper, we conclude that trial counsel did not render
ineffective assistance and deny the relief sought.

The Trial Proper

 The evidence at trial showed that in the early morning hours of February 19, 1995,
applicant broke into the home of Esperanza Palomo with intent to steal a TV and some stereo
equipment. Esperanza, who was 68 years old at the time of the offense, was babysitting her
blind five-year-old granddaughter, Amanda, while Amanda's parents went out. 

 Earlier in the day, Amanda and her parents, Oscar and Patricia Palomo, visited and
had lunch with Esperanza in her home. Later that evening, Oscar and Patricia went out for
a night of dancing. When Amanda's parents returned to Esperanza's house, they knocked
on the door, but no one answered. Oscar entered through a side window and discovered his
mother's and daughter's bodies. 

 Both Esperanza and Amanda were lying in pools of blood and had been stabbed
multiple times with a knife. Esperanza had been raped. Esperanza's night clothes were
pushed up around her neck, and her underwear had been removed. Amanda had been
wearing underwear, but they also had been removed. (1) In vain, the hysterical couple
administered CPR to Amanda and called 911. 

 Not more than one hour after the murders, applicant told several of his friends,
including his cousin Roberto Galvan, that he had killed two people. He repeatedly said to
them, "I killed her; I can't believe I killed them." Another acquaintance, Michelle Foley, 
who saw applicant after the murders, testified that applicant said he could not believe he had
killed two people and that he wanted to go back and get the knife he left at the crime scene. 
Then, on his way to his father's house, applicant encountered his paternal aunt, Lisa
Martinez, and told her that he had killed two people. When applicant arrived at his father's
house, he told his father and his father's girlfriend that he had robbed and murdered two
people. Applicant's father called police after applicant discarded the bloody clothing he was
wearing and said that he was going to return to the scene of the murders to dispose of
evidence and retrieve his knife. Applicant was apprehended on his way back to Esperanza's
home. Once arrested, and while en route to the sheriff's department, applicant indicated that
he wanted to confess to the murders, saying that he "really f____d up this time" and
"want[ed] to tell [the officer] everything . . . ." Applicant later made oral and written
statements to police, confessing to both murders. Blood, hair, and semen samples identified
applicant as the perpetrator. Police recovered several pieces of jewelry and a telephone
identified as Esperanza's from applicant; Applicant's fingerprint was found on the telephone. 

 In his written confession, which was admitted before the jury, applicant provided
details of the offense. Applicant stated that he was at his grandparents' house before
committing the offense. He explained that Esperanza's house was located across the street,
and he went there with the intent to rob her. Applicant broke in through the front door by
cutting through the outer screen door, unlatching it, and shoving open the front door with his
shoulder. Once inside, he explained, Esperanza came toward him swinging a baseball bat. 
Applicant stabbed her, and she fell to the floor immediately. (2) Applicant then "got on top of
her," "pulled up her gown" "past her breast," and "began to rape her." Applicant stated that,
initially, Esperanza "wasn't fighting me because we have been seeing each other for a
while"; that he had "been with her earlier that afternoon about 2:00 p.m."; that "[e]verytime
I would go to her house, she wanted me to make love to her"; and that "[s]he is the type of
lady that goes to bars and sleeps around with a lot of men." Applicant said he stabbed
Esperanza several times. After killing and raping Esperanza, applicant heard Amanda
"yelling and crying" from the bedroom. He then went into her room and 

 climbed on top of her. I hit her once in the face and I thought
she had fallen asleep. I then began to play with myself on top of
the little girl. I played with myself until I came on top of the
girl. I think I came on her stomach or on her blouse. After I
came she began crying then I stabbed her several times. I didn't
want to stab her but I did because she kept crying. After I
stabbed her I got my clothes, zipped up and left the house
through the front door. 

 

 Applicant also stated in his confession that he had not been drinking or using drugs
before he committed the offense. 

The Writ Proceedings 

 As noted, appointed trial attorneys, Ricardo Flores and Fela Olivarez, filed affidavits
in response to the issues designated by the trial court. While some of the averments were too
conclusory to assist in our decision, the following portions of counsels' affidavits, in
summary form, contributed to our resolution of applicant's Sixth Amendment claims. 

 Both Flores and Olivarez stated that they met with applicant several times before trial,
and they spent many hours during those meetings reviewing the voluminous inculpating
evidence with applicant. 

 Flores averred that he conferred with applicant's paternal relatives who live in
Hidalgo County, but their testimony, in Flores' belief, would have benefitted only the State. (3) 
Flores made three trips to Houston to confer with applicant's mother, step-father, and
siblings. They were "unavailable" for the third scheduled meeting, and during the first two
meetings, the family members were "not very forthcoming with information about Mr.
Martinez and his childhood"; the conferences were "inconveniences" to applicant's mother
and stepfather; "they remained aloof; they were not interested in testifying at trial; but that
they would agree to do so "if really necessary." Flores stated that, "all [applicant's family
members] refused to appear as witnesses," but, at the last minute, Olivarez was able to
convince applicant's mother (Alma Martinez) and brother, Brian, to testify at punishment. 
Flores noted that the applicant's mother's punishment testimony was far more harmful than
helpful. 

 Flores stated in his affidavit that he hired Dr. A.J. Alamia, Jr., Ph.D., "to assist in
developing questions, issues, and insight concerning [applicant's] mental state at all times
germain [sic] to the case." Specifically, Flores stated that Dr. Alamia "provided direction,
research and insight into the substance abuse issues raised in the case," and he questioned
witnesses on the use, abuse, and effects of Rohypnol and assisted in developing those issues
for trial. 

 After considerable delay, Dr. Alamia filed an affidavit in response to the convicting
court's order. Much of his affidavit was too conclusory to be of much assistance in the
resolution of the fact issues relating to applicant's Sixth Amendment claims. However, Dr.
Alamia averred, importantly, that when conducting "a developmental history and assessment
for abuse . . . [t]he results yielded no indication that [applicant] had been abused and he also
denied any history of sexual or physical abuse." Dr. Alamia further averred that he "followed
up" on these questions with applicant's family, and accordingly, Dr. Alamia concluded that
"there was no data to substantiate that [applicant] had been abused." After conducting
several clinical tests, Dr. Alamia concluded that applicant's "thought process was coherent,
logical and relevant; that applicant had not had any delusions or hallucinations; that
applicant's cognitive function had been found to be alert; that applicant had been oriented
to person, place, time and situation; and that applicant had not been insane at the time he
committed this capital murder." 

 Pursuant to our second remand, the convicting court held a hearing, at which trial
counsel Flores and Olivarez both testified. Olivarez testified that she was "second chair"
counsel in applicant's case, and she had been licensed for two years by the time of trial. In
accordance with "lead counsel" Flores's wishes, Olivarez's role in the case was to take notes
during witness interviews and at trial. Olivarez recalled that Flores took at least three trips
to Houston to interview applicant's family, but she did not accompany him on any of those
visits. 

 The only mitigation evidence Olivarez remembers reviewing was an expert report
prepared by Dr. Alamia. (4) Olivarez did not remember whether intoxication was a potential
mitigation issue and did not do any research on the effects of Rohypnol. Olivarez could not
recall if lead counsel ever discussed his defensive theories of the case with her. 

 Olivarez testified that she reviewed applicant's school records, but she could not recall
any details from that review, and in particular, Olivarez could not recall the names Ray
Highfield or Erma Mitchell, both of whom served as separate guardians to applicant in 1990. (5) 
In summary, Olivarez did not interview witnesses, nor did she play any significant role in the
trial itself. 

 Flores had been licensed for nearly twenty years at the time of trial and had
represented three other capital defendants to jury verdict. He acknowledged that Olivarez's
participation in the trial was "a learning aspect," although he noted that Olivarez convinced
applicant's mother, who had been reluctant to assist applicant throughout the proceedings,
to testify during the punishment phase of trial. 

 Flores further averred that he interviewed applicant's mother and stepfather but that
they were "not very forthcoming with information about [applicant] and his childhood." 
Applicant's mother refused to testify until convinced to do so by the pleas of Olivarez. 
Flores also stated that efforts were made to obtain school records pertaining to applicant's
childhood but "few such records could be obtained." He stated that information was not
readily available from "any source that was contacted about [applicant's] care takers" and
that applicant's family members were not cooperative.

 When asked what his defensive theories were at punishment, Flores testified that
applicant's young age was an issue, as well as his diminished capacity at the time of the
offense. Flores testified, however, that he did not believe applicant was entitled to a
mitigation defense based on diminished capacity because the intoxication did not cause
applicant to suffer from "memory wipe," noting that applicant recalled the details of the
crime and sought to recover evidence, particularly the knife. Flores also noted applicant's
possible emotional problems and family background problems, but stated that "there was not
a lot of information on that."

 Flores testified that he met with applicant's mother and stepfather in Houston at least
twice, and that his investigator, Xavier Guerra, confirmed this. However, Flores could only
recall details from the first of those meetings. Flores told the family what applicant had been
charged with, informed them about other matters "of public record" related to the case, and
obtained some general information. At the conclusion of the meeting, Flores was introduced
briefly to some of applicant's brothers, but Flores did not question them. Flores could not
locate the notes he took during this Houston interview. 

 After this initial meeting, Flores attempted to set up subsequent meetings with
applicant's family while Flores was in Houston on other matters, but each time he telephoned
them, they declined to participate, saying that they had to go shoppingor that they were not
going to be home when Flores was able to meet with them. When asked whether applicant's
family in Houston was uncooperative, Flores stated "Well, all I can tell you is, we could not
connect. I never was told, go away, don't bother us, leave us alone, except when we wanted
mom [to testify]."

 Flores stated that he met with a number of applicant's paternal relatives "in the
Valley," including a cousin, an aunt, and "some other relatives," but he could not remember
any of their names and could not find his notes from those meetings. Flores said he met with
these relatives as a group in a conference room. Flores also met a few times briefly with
applicant's father and girlfriend. Applicant's father, José Angel Martinez, III, could not
provide much background information on applicant's childhood because Martinez had been
in prison out of state most of that time. Applicant had lived with his father for less than a
year preceding the offense. 

 Flores stated that sexual abuse was something he and Olivarez "considered and
discussed and were concerned about, but . . . had no information about." To investigate the
possibility of sexual abuse before testifying, Flores stated that he specifically questioned
applicant about it, but he did not admit to any sexual abuse. Flores testified that he asked Dr.
Alamia to ask applicant about possible sexual abuse, but applicant did not divulge any
information about sexual (or physical) abuse to Dr. Alamia, either. Further, Flores testified
that he asked applicant's father about possible sexual abuse, but he was not aware of any
such history. Flores testified that he did not remember asking applicant's brother, Brian
Martinez, about any possible sexual abuse. Flores spoke only briefly with Brian just prior
to his testimony during the punishment phase of trial. Flores recalled asking Brian about
"any sorts of problems he and applicant had encountered in their childhood." But, while
Brian informed Flores of the physical abuse, he said nothing about any sexual abuse. Flores
stated that he never had the opportunity to question applicant's mother about sexual abuse. 
He stated that the only preparation for her testimony was meeting with her briefly in the
hallway before her testimony.

 Flores testified that while he was in Houston, Flores telephoned applicant's
stepbrother, Bjorn Mancias, two or three times and tried to arrange a meeting, but Mancias
was never able to meet.

 Flores asked applicant to provide him with a list of relatives who would be able to
assist in the investigation of applicant's background. Flores' investigator, Guerra, was
directed to contact all the relatives on the list provided by applicant, but Flores did not recall
whether Guerra had been able to actually reach anyone. (6) Flores stated that Guerra obtained
some of applicant's school records and that these were the only records Flores had pertaining
to applicant prior to trial.

 Flores testified that he did not interview any of applicant's teachers or counselors, nor
did Flores interview applicant's maternal grandmother, with whom applicant had lived for
five years during the time applicant's mother had abandoned him and his brother Brian. 

 I. Standard of Review

 A defendant claiming ineffective assistance of counsel under the Sixth Amendment
to the United States Constitution must demonstrate that (1) counsel's conduct "fell below an
objective standard of reasonableness," and (2) this incompetence caused the defendant
prejudice. Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984). When assessing the
reasonableness of an attorney's investigation, a reviewing court must consider the quantum
of evidence already known to counsel and whether the known evidence would lead a
reasonable attorney to investigate further. Wiggins v. Smith, 539 U.S. 510, 527 (2003). 
"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that
makes particular investigations unnecessary. [A] particular decision not to investigate must
be directly assessed for reasonableness in all the circumstances, applying a heavy measure
of deference to counsel's judgments." Id. at 522-23 (quoting Strickland, 466 U.S. at
690-691). 

 II. Was counsel constitutionally ineffective for failing to investigate and
present a temporary insanity defense based on voluntary intoxication?


 At trial, the testimony varied on how much mind-altering substances applicant
ingested prior to the murders. (7) A wide range of evidence, admitted from various witnesses,
tended to show that applicant had consumed from one to eight doses of Rohypnol, and
possibly also drank alcohol, smoked marihuana, and used cocaine. Rohypnol is a strong
psychoactive drug, and witnesses testified that applicant appeared to be "incoherent," "high,"
"tripping," "freaking out," and that he "looked crazy" after the murders. But in his
confession to police, applicant denied using drugs or alcohol on the night of the murders. 

 In support of his argument that counsel was ineffective for failing to investigate and
present a mitigation case based on temporary insanity, applicant includes, as an exhibit to his
writ application, a statement from J. Thomas Payte, M.D. Dr. Payte concluded that: 

 a defense based upon temporary insanity due to drug
intoxication would have been viable given the substance with
which [sic] Mr. Martinez had taken. Further, this defense theory
would not have been novel. Rohypnol is a relatively powerful
tranquilizer, more powerful than Valium, and there is evidence
to suggest that Mr. Martinez had taken up to ten (10) tablets that
evening. As the level of intoxication increases, the intoxicated
persons's [sic] cognitive understanding and appreciation of right
and wrong lessens. The greater the intoxication, the more the
line begins to blur and a person is less likely to understand or
appreciate the nature of his conduct. It is, therefore, quite
conceivable that Mr. Martinez was intoxicated to the extent that
he could not have appreciated the rightfulness or wrongfulness
of his conduct on the evening in question. The fact that
Rohypnol use and abuse has been associated with black outs
[sic] and memory lapses further lends support to the theory that
a person intoxicated through the use of the drug might not have
understood that [sic] the nature of his conduct. 


 Applicant further complains that, despite the information of applicant's intoxication,
counsel did not request the appointment of "a pharmacologist or any other medical or
scientifically trained individual to advise him." 

 Evidence of voluntary intoxication may serve to mitigate the severity of an offense
where the effect of the intoxication is to render the defendant temporarily insane. Tex. Pen.
Code Ann. § 8.04(b) (Vernon 2005). To be entitled to the mitigating instruction based on
voluntary intoxication, it must be shown that the convicted person was unable to understand
the wrongfulness of his conduct. Because the evidence at the guilt phase of trial shows that
applicant was well aware that his conduct was wrong, we conclude that counsel was not
deficient for failing to present a mitigation case based on temporary insanity. See id. 

 Trial counsel were not ineffective for failing to request an instruction on temporary
insanity because applicant stated in his confession that he had not been using drugs or
alcohol, he immediately confessed to the crime, he repeatedly told his friends that he could
not believe he had committed the murders, and he told the arresting officer that he had "really
f____ed up this time." All of this evidence establishes that applicant was indeed aware of
the wrongfulness of his conduct; thus, a mitigation instruction would not have been
supported by the evidence. See Mendenhall v. State, 77 S.W.3d 815, 817-18 (Tex. Crim.
App. 2002) (it is an affirmative defense to prosecution that, at the time of the alleged offense,
the defendant, as a result of a severe mental defect caused by involuntary intoxication, did
not know that his conduct was wrong). 

 What is more, Galvan, who saw applicant approximately one hour before and one
hour after the offense, described applicant's behavior as heavily intoxicated, but he did not
describe applicant as incoherent, psychotic, or enraged. (8) Nevertheless, applicant further
suggests, according to Dr. Payte's affidavit, that counsel was ineffective because Rohypnol
is known to cause out-of-character behavior; i.e., "Mr. Martinez's Rohypnol use may have
been a contributing factor to, or an explanation of his conduct." Specifically, Dr. Payte
opined that, given applicant's non-violent past and the violent nature of the offense, a
mitigation defense of temporary insanity should have been pursued because, although rare,
Rohypnol can cause "behavior disinhibition, rage, aggression, suicidality, amnestic reactions,
and cognitive disturbances" and "[t]he known potential effects of these drugs suggest the
possibility of a role of drug induced disinhibition with associated rage and aggression as a
contributory factor in the commission of acts of extreme violence which occurred in this
case." 

 Although it may be true that Rohypnol abuse, while rare, may possibly cause violent
behavior in otherwise non-violent users, the trial record reflects that even when applicant was
not taking Rohypnol, his behavior was hardly non-violent. For example, at the punishment
phase of trial, the jury heard evidence that, while awaiting trial, applicant and another inmate
wrote a letter to then President Clinton, threatening to kill him and rape his wife and
daughter. In the letter, applicant also threatened the life of then Vice President Al Gore. A
secret service agent who investigated the threats testified at the punishment phase of
applicant's trial, saying that he asked applicant about the threat and that applicant admitted
to writing the letter and reaffirmed his desire to carry out the threats. Because he was
incarcerated in the county jail on these two occasions, we may assume that applicant had not
taken Rohypnol, yet he clearly exhibited a violent nature. 

 Even if Rohypnol can cause psychosis or rage reaction, these affects would not
support a mitigation defense here because, as we explained in Mendenhall v. State, the test
to support an intoxication defense is whether the actor was aware of the wrongfulness of his
conduct. In Mendenhall, we stated that the defense of temporary insanity due to voluntary
intoxication is not available to defendants who claim that they were unconscious or
semi-conscious at the time of the alleged offense because they may argue either that they
lacked the mens rea necessary for criminal liability, see Tex. Pen. Code Ann. § 6.02(a)
(Vernon 2003), or that they did not engage in a voluntary act, see id. § 6.01(a). See
Mendenhall, 77 S.W.3d at 818. (9)

 But even if applicant's theory were to support such an instruction, there is no
indication from the evidence adduced at the guilt stage of trial that applicant was
experiencing a rage reaction or psychosis when he committed the murders. Instead, what the
evidence shows is that applicant broke into Esperanza's home with the intent to steal
valuables. Other than applicant's statement that Esperanza threatened him with a baseball
bat, there was no evidence of a struggle between applicant and Esperanza. She died almost
instantly because applicant stabbed her in the neck, severing an artery. Applicant then raped
her. This evidence does not suggest a rage reaction so severe that applicant could not
understand the wrongfulness of his conduct. Applicant, according to his own confession,
then sought out the terrified blind child who was on her bed, climbed on top of her, punched
her in the face, performed a sex act on her, and then stabbed her multiple times because she
was crying. None of this evidence suggests a drug-induced rage that prevented applicant
from knowing what he was doing was wrong. See Mendenhall v. State, 77 S.W.3d at 817-18. 
On the contrary, there was ample evidence that applicant had a keen understanding of the
wrongfulness of his conduct; therefore, he was not entitled to the instruction, even if he was
in a drug-induced rage or psychosis. 

 At the writ hearing, Flores testified that he did not pursue an insanity mitigation
defense because applicant was able to recall the details of the crime, applicant was concerned
about retrieving his knife and concealing evidence, and applicant had not experienced
"memory wipe." Moreover, Dr. Almia, who advised Flores, concluded from his clinical
tests, that applicant had not been insane at the time of the offense. In addition, applicant has
failed to demonstrate that the drugs he voluntarily took indeed caused a psychotic reaction
so debilitating that he could not understand the wrongfulness of his conduct, and thus, he was
entitled to a mitigating instruction of voluntary intoxication. (10) Because the facts adduced at
trial and at the writ hearings do not support the mitigation defense of temporary insanity, trial
counsel were not deficient for failing to further investigate and pursue the defense. See
Sawyers v. State, 724 S.W.2d 24 (Tex. Crim. App. 1986) (evidence showing the defendant
was intoxicated and nothing more does not justify submission of an issue on temporary
insanity, and refusal to submit such charge in mitigation of punishment is not error); Ex parte
Lilly, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) (counsel's failure to investigate the facts
of a case constitutes ineffectiveness if the result is that any viable defense available to the
accused was not advanced). We conclude that, had counsel requested an instruction on
temporary insanity as a mitigating factor, it would have been properly denied. See Hart v.
State, 537 S.W.2d 21, 24 (Tex. Crim. App. 1976) (holding that the evidence at trial showed
Hart was aware that what he was doing was wrong). Similarly, because applicant knew his
behavior was wrong, a denial of a county-funded appointment of an expert would not have
been trial court error. Therefore, we hold that counsel were not ineffective for failing to
further develop a mitigating intoxication defense, for failing to request that an expert be
appointed, or for failing to request an instruction based on temporary insanity. See Wiggins
v. Smith, 539 U.S. at 527. We deny relief on applicant's first claim. 

 III. Did counsel render constitutionally ineffective assistance of counsel during
the punishment phase of trial by failing to conduct an adequate
investigation into physical, emotional, and sexual abuse?

 

 In his second claim, applicant complains that counsel was ineffective for failing to
discover and introduce evidence that applicant had suffered neglect and severe physical and
sexual abuse throughout his childhood. We summarize below the evidence presented at the
punishment phase of trial and the affidavits in support of the Sixth Amendment claim.

A. Deficient Performance

 At the punishment phase of trial, defense counsel presented two witnesses on
applicant's behalf--applicant's mother, Alma Martinez, and his brother, Brian Martinez. 
Alma had refused to testify in applicant's behalf, but at the last minute, Olivarez convinced
her to drive from Houston to Hidalgo County and testify on applicant's behalf at punishment. 
In addition to Brian, Alma brought her half-sister, Elda Reyes, to testify at the punishment
proceedings; however, Flores chose not to call her because she smelled of alcohol. 

 Alma testified that she abandoned applicant and his brother Brian shortly after
divorcing their father, José Angel Martinez, III, who, she said, was physically abusive to her. 
Applicant was about five years old when she left, and she did not return for five years, during
which time applicant and Brian lived with their maternal grandparents. Alma never saw
applicant or Brian during those five years and explained that she got involved with another
abusive man and married him. Alma testified that, at the direction of this husband, she
committed forgery, spent some time and in jail for the offense, and ultimately received
probation. (11) After divorcing this second husband, Alma returned to retrieve applicant and
Brian. Thereafter, they lived together in Houston in a house next door to Alma's mother and
stepfather. Alma stated that she knew her mother and stepfather had "abuse[d] my kids." 
Alma explained that, at the slightest provocation, her stepfather "would kick my kids, grab
the belt, swing them against the wall or use his fists." 

 Alma testified that, after reuniting with applicant and Brian, she "had to be on
welfare" because her mother "forced" her to quit her job and stay home with the kids. Alma
testified that applicant would run away from home, "maybe for the things [she] had done,"
and on one occasion, he went to live with some members of a church group for a month or
two. Alma testified that applicant's father, Angel, had no contact with applicant, except for
one telephone call upon Angel's release from prison. Alma testified that, thereafter, Angel
never paid any child support.

 On cross-examination, the State asked Alma a series of questions about her own
family and how she would feel if they had been murdered in the same way applicant had
murdered Esperanza and Amanda. After this line of questioning continued for some minutes,
Applicant blurted out, "Leave my mom alone, man." Alma responded immediately, "Why
did you do it[,] Noey?" The jury was immediately excused, and Alma was admonished "not
to address any statements to the defendant in this case." When the jury returned, the State
asked one question of Alma, i.e., "Should a thief, a rapist and a killer pay for their [sic]
crime?" Alma responded, "Yes." On redirect examination, Flores did not ask Alma anymore
questions, and she was excused.

 Trial counsel then called applicant's brother to the stand. Brian testified that living
with their grandparents was "terrible" because he and applicant "always got beat." Brian
testified that he still harbors "hate" for his mother for abandoning him and his brother with
his abusive grandparents. 

 In his writ, applicant attaches affidavits of four relatives--applicant's brother Brian,
an aunt, an uncle, and his step-brother Bjorn Mancias--who allege severe physical and
emotional abuse by Alma, as well as evidence of sexual abuse by Alma. According to the
affidavits, Alma's abuse of applicant and Brian was just as bad as their grandfather's. Alma
beat the boys severely on a daily basis, and subjected them to harsh verbal assaults. She used
drugs in front of them and often kicked them out of the house. Bjorn states in his affidavit
that applicant's mother was an "atrocious mother" and that he is "surprised that any of the
boys survived past the age of 10." Bjorn further averred that he suspected that applicant and
his brothers were sexually abused by Alma. Applicant's maternal aunt, Elda Reyes, states
in her affidavit that Alma frequently beat applicant and was verbally abusive to him. Reyes
also avers that Alma had sexually abused her and other family members. Reyes states that,
had trial counsel called her to the stand, she would have testified to these facts. Applicant's
uncle, Raul Guanajuato, avers in his affidavit that Alma was extremely physically and
verbally abusive to applicant, and that prior to the murders, applicant had always been non-violent. Guanajuato stated that Flores never contacted him, and if he had, Guanajuato would
have testified to the facts stated in his affidavit. 

 Applicant also attaches affidavits by Rev. Ray Highfield and his wife Earlene, with
whom applicant lived for two months in 1990. The Highfields aver that applicant came to
live with them because applicant's mother "refused to take him back" after church services
one day. Ray Highfield stated that it was obvious applicant had been abused; that the homes
the family had been living in were "small, dirty, and inadequately furnished"; that he saw a
cut on applicant's hand and applicant told him that his mother had stabbed him; that applicant
was "badly in need of love and attention," and that it was "obvious that he had been
neglected all of his life"; that applicant always wanted hugs, which was unusual for an
eleven-year-old boy; that applicant mentioned that his mother brought men into the home and
slept with them in front of applicant and his brother; and that applicant was underfed and
often talked about being hungry when in his mother's care." Ray Highfield averred that
applicant left his home to live with Erma Mitchell, but after about a month, applicant's
mother wanted him back, not because she loved him, but so that she could continue receiving
food stamps. Both Ray and Earlene Highfield stated that applicant's trial counsel did not
contact them, but if they had been contacted, the Highfields would have testified in
applicant's behalf at punishment. 

 Applicant also attaches an affidavit by an investigator with some social work training. 
The investigator states that she interviewed Alma, who admitted to physically abusing
applicant as badly as he was abused by his grandfather. The investigator also states that
Brian admitted to her that he was sexually abused as a young child by their father and later
by their mother, and that Brian suspected applicant had been sexually abused as well. 
Finally, the investigator avers that applicant admitted to her that he had been sexually abused
by Alma on a regular basis, sometimes at knife point or under other threats of violence. 

 Applicant claims that counsel's minimal investigation into his background fell below
an objective standard of reasonableness, and that the deficiency was particularly notable in
light of the fact that applicant's mother, who was herself a primary abuser, was the chief
punishment witness on applicant's behalf. The only other witness, applicant complains, was
his brother Brian, who was interviewed for the first and only time immediately before his
testimony. 

 We hold that trial counsel's performance did not fall below an objective standard of
reasonableness under prevailing professional norms. See Wiggins, 539 U.S. at 521. We
further hold that, even if "trial counsel were deficient for failing to adequately investigate and
put forth all the evidence of applicant's history of abuse," applicant was not prejudiced by
the alleged deficient performance. See id. at 534 (quoting Strickland, 466 U.S. at 692 "to
establish prejudice, a "defendant must show that there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding would have been different.").

 In Wiggins v. Smith, the United States Supreme Court granted federal habeas corpus
relief based on trial counsel's failure to further investigate and put forth mitigating
punishment evidence of severe physical and sexual abuse which counsel apparently knew
about before trial. 539 U.S. at 515-16. Specifically, Wiggins's trial counsel told jurors in
opening statement that they would hear about his difficult life, including severe physical and
sexual abuse. However, trial counsel never introduced any of that known evidence, and the
jury sentenced Wiggins to death. Wiggins, 539 U.S. at 515. The Supreme Court noted that
trial counsel failed to extend their investigation into Wiggins's background beyond public
reports and records they had obtained, despite the fact that those records clearly indicated a
troubled childhood. In assessing whether counsel's performance reflected prevailing
professional norms, the Supreme Court looked to the American Bar Association Guidelines,
which emphasize that "investigations into mitigating evidence 'should comprise efforts to
discover all reasonably available mitigating evidence and evidence to rebut any aggravating
evidence that may be introduced by the prosecutor.'" See Wiggins, 539 U.S. at 524 (quoting
ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases
§ 11.4.1 (C), p. 93 (1989)) (emphasis added). Under the test set forth in Wiggins, we must
decide whether the actions taken by counsel in investigating applicant's background were
reasonable, specifically, "whether the investigation supporting counsel's decision not to
introduce mitigating evidence of [applicant's] background was itself reasonable." Wiggins,
539 U.S. at 523 (emphasis in original). 

 On the one hand, trial counsel did not discover the alleged sexual abuse, nor did he
probe the punishment witnesses for details about the physical abuse and the extent of that
abuse. And, neither Alma or Brian testified about the physical abuse Alma inflicted upon her
sons. Additionally, Flores admitted at the live writ hearing that he did not have a social
history prepared, he did not obtain CPS records that may have existed at the time, and he did
not contact either of the foster parents, Highfield or Mitchell, for an interview. And, as
noted, several of applicant's family members averred that, had trial counsel contacted them,
or otherwise, if counsel had asked them the right questions during the interviews, they would
have revealed that applicant suffered severe physical and/or sexual abuse at the hands of his
mother, his maternal grandparents, and his father, and moreover, would have appeared at the
punishment phase of trial and testified to the same.

 On the other hand, testimony at the writ hearing established that Flores repeatedly
contacted applicant's mother and stepfather in furtherance of his investigation, but they
would not cooperate. At the repeated urging of Olivarez, applicant's mother, brother, and
an aunt finally agreed to appear during the eleventh hour of trial. Thus, it cannot be
incumbent upon trial counsel to adequately prepare witnesses, who after months of urging,
decide to appear at the last moment and testify. In such circumstances , trial counsel cannot
be held accountable for failing to elicit all the evidence of physical abuse and the extent of
that abuse. And in any event, the jury had before it evidence of harsh physical and emotional
abuse. Applicant's mother admitted to abandoning applicant for five years when he was very
young and leaving him in the hands of a known physical abuser, her stepfather. She further
testified that her stepfather, at the slightest provocation, "would kick my kids, grab the belt,
swing them against the wall or use his fists," which is, of course, evidence of severe and
sustained physical abuse. All in all, her testimony painted a very bleak picture of applicant's
childhood: his mother was poor and uneducated; she was physically abused by at least two
husbands; she was involved in and convicted of at least two crimes; she heartlessly
abandoned her children in the middle of the night without saying goodbye or providing an
explanation; and applicant's father had been long incarcerated and did not seek to establish
a relationship with them or support them after being released. Brian also testified that
applicant suffered physical abuse at the hands of his grandfather, and while trial counsel
could have expanded on the evidence by asking more probing follow-up questions, this
failure can hardly be attributed to counsel alone, as both applicant's mother and brother
refused to cooperate until after the punishment proceedings had begun. 

 As to the purported sexual abuse that was not revealed or discovered until after the
sentence of death had been imposed, Flores testified that applicant had denied any sexual
abuse during their several interviews. Dr. Alamia also averred that applicant denied any
sexual abuse when questioned, and furthermore, Dr. Alamia's clinical tests reflected that
applicant had not been sexually abused. (12) Flores testified that when he interviewed Brian
prior to his testimony, Flores asked open-ended questions about abuse; specifically, Flores
asked Brian "what sort of problems Noey had encountered, what sort of things happened"
during his childhood. However, Brian apparently did not elaborate on the extent of the
abuse. Trial counsel testified that he met with and questioned several family members, and
while some of them divulged physical abuse and abandonment, no one offered any evidence
of sexual abuse. Notably too, none of the sexual abuse allegations by the various family
members would have been admissible during the punishment phase of trial because they were
based on speculation. That is, no family member averred, based on personal knowledge, that
applicant had been sexually abused in any way. (13) After the outburst in the courtroom and the
comments by applicant's mother, applicant chose not to testify in his own behalf at
punishment. Had applicant chosen to testify in his own behalf, he would have been subject
to cross-examination on matters such as his gang affiliation and his past acts of violence. 
Based on the evidence presented here, it appears that the only person who could have
testified about any alleged sexual abuse would have been applicant himself. Thus, the failure
to present evidence of the alleged sexual abuse is borne primarily by applicant, as he had
ample opportunity to divulge this evidence to his lawyer and at least one of his agents before
trial. 

 Based on the forgoing, trial counsel were not deficient under the first prong of
Strickland because the decision not to further pursue the investigation into applicant's
background was itself reasonable. See Wiggins, 539 U.S. at 523. Trial counsel repeatedly
sought to obtain information from family members, but the family members were too busy
to meet with him. Applicant did not divulge any evidence of sexual abuse until after the
sentence of death was imposed. The effects of Alma's punishment testimony cannot be
blamed solely on counsel because she chose to distance herself from the process until the last
minute. Moreover, trial counsel employed an investigator and obtained and reviewed school
records, and although more may have been done to follow up on that information, the alleged
sexual abuse could not have been elicited in admissible form from those witnesses in any
event. See Wiggins, 539 U.S. at 533 ("Strickland does not require counsel to investigate
every conceivable line of mitigating evidence no matter how unlikely the effort would be to
assist the defendant at sentencing."). Lastly, it was not unreasonable trial strategy, as
applicant now suggests, for Flores to forgo trying to rehabilitate Alma after she shouted out,
"Why did you do it, Noey?" 

 We conclude that it was not unreasonable for trial counsel to abandon further efforts
to investigate the possibility of sexual abuse once applicant told counsel that he had never
been sexually abused. While standing alone, this fact may be inadequate to justify
abandoning further investigation, see, e.g., Rompilla v. Beard, 125 S. Ct. 2456, 2460 (2005)
(even when a capital defendant's family members and the defendant himself have suggested
that no mitigating evidence is available, counsel is bound to make reasonable efforts to
obtain and review material that counsel knows the prosecution will probably rely on as
evidence of aggravation at the sentencing phase of trial), applicant's denial of sexual abuse
was compounded by his similar denial to Dr. Alamia. Plus, the school records obtained by
counsel are unremarkable with respect to any kind of abuse. In fact, the records merely
reflect abandonment by applicant's mother. And since no family members offered any
allegations of sexual abuse when asked open-ended questions about the abuse applicant
suffered, the evidence was not reasonably available before trial. See Wiggins, 539 U.S. at
524. As previously noted, had these witnesses offered this information to counsel before
trial, the evidence could only serve to bolster any sexual abuse allegations made by applicant
himself. 

 As for trial counsel's alleged failure to expand on the testimony proffered by Alma
and Brian regarding the physical abuse, again, applicant having thwarted Flores's efforts to
obtain information until after the punishment proceedings had begun, must shoulder at least
some of the blame for failing to elicit evidence. And in any event, Alma and Brian's limited
testimony painted a very bleak childhood existence. With these facts in mind, and when
applying the "strong presumption that counsel's performance fell within the wide range of
reasonable professional assistance," and in avoiding "the distorting effect of hindsight," we
hold that counsel's errors, if any, are not "so serious that counsel was not functioning as the
'counsel' guaranteed the defendant by the Sixth Amendment." See Strickland, 466 U.S. at
687, 689. That is, considering the quantum of evidence already known to counsel, including
repeated denials of physical and sexual abuse by Alma, unremarkable school records, the
knowledge of applicant's abandonment by Alma, and his grandfather's physical abuse, would
not compel a reasonable attorney to investigate further. See Wiggins v. Smith, 539 U.S. at
527; Ex parte Woods, WR-62,627-01 (Tex. Crim. App. 2005) (denying habeas relief on
Wiggins claim where trial counsel did investigate by obtaining records and talking to family
members and did present mitigating evidence, "albeit a minimal amount."). 

B. Prejudice (14)

 We further hold that, even if counsel were deficient in failing to discover and
introduce evidence of sexual abuse and a more detailed picture of physical abuse, applicant
was not prejudiced by the omission. As already explained, to demonstrate prejudice, a
defendant must show that "counsel's errors were so serious as to deprive the defendant of a
fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. "[T]he defendant must
show that there is a reasonable probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." Id. at 694. To determine whether
applicant was prejudiced by trial counsel's alleged deficient performance, "we reweigh the
evidence in aggravation against the totality of available mitigating evidence." See Wiggins,
539 U.S. at 534; Williams v. Taylor, 529 U.S. 362, 398 (2000). 

 The mitigating evidence admitted showed that applicant had suffered harsh physical
abuse by his grandfather and a long period of abandonment by his mother. He was eighteen
years old at the time of the offense. He had no prior criminal record. 

 The evidence in aggravation of death was extensive. (15) First, the jury heard evidence
that applicant planned to assassinate the President and the Vice President of the United States
and rape the First Lady and Chelsea Clinton. Second, the facts of this capital murder are
heinous. Applicant broke into Esperanza's home late at night, dealt a fatal stab wound to her
neck, and raped her. According to applicant's statement, Amanda, the blind and defenseless
five-year-old girl, heard the attack on her grandmother and started to cry. Applicant
proceeded into Amanda's room, punched her in the face, ejaculated on her body, and then
murdered her "because she was crying." Had the jury heard and believed the more extensive
evidence of physical abuse and the alleged (but inadmissible) sexual abuse, it is unlikely that
it would have had any effect on the jury's verdict. Moreover, the evidence at the guilt stage
relating to Oscar and Patricia Palomo's discovery of the bodies, their reactions to the
gruesome crime scene, and their testimony about their continued grief was compelling. It is
notable too that, in his confession, applicant attempted to depict Esperanza as a bar-hopping,
sex-crazed woman who regularly sought sexual relations with him and that she did so on the
day of the murders. Such a characterization was clearly refuted by the evidence elicited from
Oscar and Patricia, and the jury's punishment verdict could be reflective of its reasoned
moral response to a horrible crime (with devastating consequences), committed by a person
who was willing to vilify falsely his victim. 

 We must decide whether the undiscovered and unoffered evidence would have created
a reasonable probability that, had the jury heard it, the jury's verdict would have been
different. The aggravating factors in this case were severe. The omitted mitigating evidence,
if offered in admissible form and believed, was strong. Wiggins, 539 U.S. at 537-38. 
However, since the jury was privy to some of the severe abuse applicant suffered during his
childhood, there is not a reasonable probability that the unadmitted alleged mitigating
evidence would have tipped the scale in applicant's favor. See Gillard v. Mitchell,
03-4261/4322 (6th Cir. April 26, 2006) (citing Wiggins, 539 U.S. at 534). Accordingly, we
hold that even if trial counsel's punishment evidence "merely scratched the surface," as
applicant suggests, the punishment evidence that was not admitted, probably would have had
no effect on the jury's answer to the mitigation special issue. See Ex parte Woods, supra ("It
is entirely reasonable to conclude that a Texas jury would be singularly unimpressed by the
sordid details of applicant's background and bad character traits."); Hill v. Mitchell, 400 F.3d
308, 319 (6th Cir. 2005) (to establish prejudice, the new evidence that a habeas petitioner
presents must differ in a substantial way--in strength and subject matter--from the evidence
actually presented at sentencing); Johnson v. Bell, 344 F.3d 567, 574 (5th Cir. 2003). We
deny relief on applicant's second Sixth Amendment claim. 

DELIVERED: JUNE 28, 2006.

PUBLISH

 



 
1. Amanda's night clothes were pushed up around her waist. Her mother, Patricia,
testified that she could not recall if she had disturbed Amanda's clothing while attempting to
resuscitate her. 
2. The evidence showed that Esperanza had been stabbed multiple times, but one wound
cut through her aorta. Esperanza likely died within thirty seconds of receiving this wound. 
3. In fact, José Angel Martinez, III, applicant's father, Lisa Martinez, applicant's paternal
aunt, and Lisa De Le Rosa, applicant's father's girlfriend, who live in Hidalgo County, testified
for the State during the guilt phase of trial. 
4. Both Flores and Dr. Alamia stated that Dr. Alamia did not provide a written
consultation.
5. The school records indicate that applicant lived in the home of Rev. Highfield during
the earlier part of 1990 because applicant's mother had abandoned him and the whereabouts of
his father were unknown. The records further reflect that applicant lived with another guardian,
Ms. Erma Mitchell, in the later part of 1990 because applicant's mother "did not want him to live
with her." 
6. Although Flores could not specifically recall speaking with Elda Reyes, applicant's
maternal aunt, she states in her affidavit that Flores telephoned her several times prior to trial,
presumably to obtain information.
7. Applicant did not testify during the guilt phase or the punishment phase of trial. 
8. Applicant attaches an exhibit to his writ which provides a compilation of Rohypnol
case scenarios. The writ evidence documents some rare effects of Rohypnol abuse, including
confusion, disorientation, and the inability to remember the things the actor did during the violent
or psychotic episode. Based on the evidence adduced at the guilt phase, however, there was
little, if any, such evidence admitted through the State's witnesses. So, even if we were to
entertain the theory which applicant now advances, i.e., that trial counsel were ineffective for
failing to pursue an insanity defense because he may have been experiencing violent effects of
Rohypnol abuse, the writ evidence he sets forth in support of this claim does not meet the test
necessary to receive the instruction. That is, the case scenarios describe violent behavior while
under the influence of excessive doses of Rohypnol, but none of the subjects could later recall the
violent actions they took. Here, the trial testimony shows that applicant had a vivid recollection
of the events, and even sought to return to the crime scene and retrieve his knife.
9. Although applicant did not advance the theories that counsel were ineffective for failing
to pursue a defense based on lack of mens rea or lack of a voluntary act, the evidence at trial,
particularly applicant's own statement, belies those theories. 
10. It is noteworthy that Dr. Payte does not aver that, in his opinion, applicant was indeed
suffering from the paradoxical effects of Rohypnol, but rather, he concludes it was "quite
conceivable" applicant "was intoxicated to the extent that he could not have appreciated the
rightfulness or wrongfulness of his conduct on the evening in question."
11. Trial counsel also elicited testimony that sometime after applicant came to live with
her, she was charged with auto theft and received probation.
12. Applicant's writ investigator James McKay states in his affidavit that Dr. Alamia told
him that Dr. Alamia had concluded, prior to trial, that applicant had suffered sexual abuse. 
13. One maternal aunt, "Frenchy" Reyes, averred in her affidavit that Alma sexually
molested her by squeezing her breasts and attempting to remove her pants. Frenchy further
stated that she observed Alma sexually molest her youngest son, Leonard, when he was a toddler,
by manipulating his penis for several minutes. 
14. Applicant does not set forth any legal or factual arguments, either in his writ or in his
brief to this Court, how applicant was prejudiced by the alleged failure to present a more detailed
picture regarding the physical abuse he suffered or the alleged sexual abuse. Accordingly, we
would be authorized to deny relief on this failure alone. See Strickland, 466 U.S. at 697 (a
defendant's failure to satisfy one prong of the two-part test for ineffective assistance of counsel
negates a court's need to consider the other); Russeau v. State, 171 S.W.3d 871, 881 (Tex. Crim.
App. 2005) (declining to address appellant's confrontation claim under the Texas Constitution
because appellant provided no argument or authority for such claim, citing Tex. R. App. P.
38.1(h)).


.
15. Both parties asked that the jury consider evidence from the guilt phase of trial during
punishment, and the jury was so instructed.